UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
CHOICE MONEY TRANSFER, INC., :
          :
         Plaintiff, :     17 Civ. 2639 (JSR)
          :
         -v- :     OPINION AND ORDER
          :
SOCIETE INTERNATIONAL DE CHANGE, :
ARIMEC, LLC, and MOHAMED NAGEM A/K/A :
MOHAMED OULD NAGEM A/K/A MOHAMED :
MUSTAPHA NAGEM, :
          :
         Defendants. :
------------------------------------ x



JED S. RAKOFF, U.S.D.J.

      Plaintiff Choice Money Transfer, Inc. ("Choice") provides
consumer money transfer services, facilitating international money
transfers in 181 countries worldwide. See Plaintiff's Response to
Defendants' Rule 56.1 Statement of Undisputed Material Facts and
Counterstatement of Facts ("Pl. Response to Rule 56.1 Statement) ¶¶
5-6, ECF No. 31; Defendants' Reply to Plaintiff's Rule 56.1(b)
Counterstatement of Material Facts ("Defs. Reply to Rule 56.1
Counterstatement") ¶ 6, ECF No. 32. Defendant Societe International
de Change ("SIC") is a Mauritanian company that, among other things,
executes payments for international money transmitters, such as
Choice. Id. ¶ 1. Defendant Arimec, LLC ("Arimec") exports goods from
the United States to Mauritania and, most relevant here, owns the
bank account to which Choice made payments to SIC. Id. at ¶ 2.
Defendant Mohamed Nagem is the majority owner and president of the
board of SIC and sole owner of Arimec. Id. at ¶ 3.

In this action, Choice makes claims for breach of contract, fraud, and money had and received, alleging that SIC, beginning in 2013 and continuing through February 2017, improperly calculated and deliberately obfuscated its invoices so as to conceal the miscalculation. Specifically, Choice alleges that SIC provided it with U.S. Dollar ("USD")/Mauritanian Ouguiya ("MRO") and Euro/MRO exchange rates inconsistent with the USD/Euro exchange rate and calculated amounts owed by applying the USD/MRO rate to the total number of MROs paid out regardless of whether the transaction originated in Euros or dollars. The result, says Choice, is that SIC requested and received payment beyond what it was owed. See Complaint, ECF No. 1. In addition to denying those claims, SIC brings a counterclaim for breach of contract based on Choice's refusal to pay SIC's final invoice. Answer, Affirmative Defenses and Counterclaim of Defendants Societe International de Change, Arimec, LLC, and Mohammed Nagem, ECF No. 19.

Before the Court is the motion for summary judgment of defendants SIC, Arimec, and Nagem. Memorandum of Law in Support of Defendants' Motion for Summary Judgment Pursuant to Rule 56 of the Federal Rules of Civil Procedures ("Defs. Mem."), ECF No. 26. For the reasons set forth below, the Court grants the motion in part and denies it in part. Specifically, the Count denies summary judgment on both parties' breach of contract claims because there is a genuine dispute as to whether SIC breached an obligation to set MRO exchange

2

rates consistent with the USD/Euro rate and as to whether the voluntary payment doctrine bars Choice's breach of contract claim. The Court grants summary judgment for defendants on Choice's claims for money had and received and fraud because those claims arise out of the same subject matter as, and legal duties derived from, the parties' written agreement.

It is, of course, a truism that summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of demonstrating the absence of any genuine disputes of material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). In determining whether summary judgment is appropriate the court must resolve all ambiguities and draw all reasonable inferences against the movant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The pertinent facts, undisputed except where indicated, are as follows:

SIC and Choice entered into a written agreement "made as of July 1, 2007," pursuant to which SIC would serve as Choice's delivery correspondent in Mauritania (the "Agreement"). Pl. Response to Rule 56.1 Statement ¶ 13. As Choice's delivery correspondent, SIC was obligated to deliver funds to beneficiaries in Mauritania in the

3

local currency – Mauritanian Ouguiya – in accordance with Choice's payment instructions. Id. ¶¶ 16-17. Under Section 5.2 of the Agreement, Choice agreed "[t]o deposit into [SIC's] bank account (as per instructions) the equivalent of the funds, which [SIC] delivered to the Beneficiaries in the Territory [of Mauritania] on a daily basis or as agreed upon between [SIC] and [Choice]." Id. ¶ 19. SIC originally acted as the delivery correspondent only for transactions originating in the United States. Id. ¶ 24. At some later point, SIC began acting as the correspondent for European transactions as well. Id. ¶ 25.

In practice, the parties fulfilled money transfer requests in the following manner: First, before Choice's customers made any money transfer requests, SIC provided Choice with MRO exchange rates. Defs. Reply to Rule 56.1 Counterstatement ¶ 28. SIC did this even though the Agreement neither required SIC to set the exchange rates nor established the mechanism by which it was to establish MRO exchange rates. Id. ¶ 26. Choice allowed SIC to set the rates at which SIC would pay out in local currency because SIC had knowledge of the local market. Id. ¶ 27. Two factors SIC considered in setting rates were the rates of Choice's competitors, such as Money Gram and Western Union, and the rates set by the Central Bank of Mauritania. Pl. Response to Rule 56.1 Statement ¶ 30. Second, Choice would receive customer requests for money transfers to Mauritania, passing on to its customers the rates provided by SIC. Id. ¶ 32. Third, after

4

SIC paid MRO to the beneficiaries, it would seek reimbursement by Choice. Id. ¶ 27(g). SIC would issue an invoice to Choice requesting reimbursement for the MRO it had paid, plus the commissions due SIC. Id. ¶ 27(h). Choice was to pay a 30% net commission per order to SIC for all MRO payments originating in the United States, and a 25% commission on such payments originating in Spain and Italy. Reply to Defs. Rule 56.1 Counterstatement ¶ 22. Fourth and finally, Choice would pay SIC's invoices. Pl. Response to Rule 56.1 Statement ¶ 27(i). Choice almost always paid the invoices in USD, although SIC expressed a desire to be paid in Euros. Id. ¶¶ 27(k), 60-61.

In the beginning of the parties' relationship, Dr. Joseph Neuschatz, the head of treasury and vice president of Choice, id. ¶ 8, reviewed SIC's invoices to determine whether the exchange rates SIC provided tracked the USD/Euro rate, id. ¶ 53. Later, however, Neuschatz "only very casually checked." Id. ¶ 54. According to Choice, Neuschatz began only casually checking the rates because he "had built up trust with SIC . . . [and] trusted that [SIC] was . . . presenting these invoices with integrity." Id. ¶ 55, By contrast, defendants suggest that it was simply "because [Choice] had . . . a tremendous amount of work and then it was very difficult for - for [it] to do that." Id. All parties agree that "[a]t the time [Choice] received each invoice from SIC it had the independent ability to verify whether the USD/MRO and EUR/MRO rates were tracking the USD/EUR rate." Id. ¶ 57.

5

In late May 2008, SIC and Choice discussed how Choice would reimburse SIC for Euro-originating transactions. According to Choice, but disputed by defendants, Neuschatz had "several" discussions with SIC about the importance of SIC's setting out MRO exchange rates that tracked the USD/Euro exchange rate. See Defs. Reply to Rule 56.1 Counterstatement ¶ 42. Nagem asked Neuschatz: "For Euro let's say the rate is 360 (to simplify) and we pay about 3,600,000 MRO on [Choice's] behalf, the equivalence of about 10,000 EURO, you would then take the 3,600,000/USD (237.35) to get = $15,167,474? A[m] I right about this? [O]r would you convert the 10,000 Euro to USD and pay us about $15,500?" Id. ¶ 47. Neuschatz responded, "I would take the total in the local currency and divide it by the dollar rate and get the amount in dollars that Choice would have to pay. If you paid 3,600,000 then we would divide that by the rate and pay the dollar equivalent. . . . I would use the same rate as I use for the US funding." Id. In an email several days later, SIC, providing Choice a Euro/MRO exchange rate, stated that the rate would be "more competitive than any rate money gram is offering in all European countries" and highlighted that "the equivalence of this [rate] would be 1EU=$1.55, which is what the current market is today (1.5628)." Id. ¶ 50.

Nearly four years later – and about one year before SIC allegedly began seeking excessive reimbursement – Choice and SIC exchanged a series of emails in which Choice raised questions about

how SIC set the MRO exchange rates. Upon receiving an invoice from
SIC, Neuschatz complained that the Euro/MRO rate seemed too high. Pl.
Response to Rule 56.1 Statement ¶ 41. Specifically, Neuschatz asked,
"Isn't the euro rate supposed to relate to the dollar rate? Isn't the
euro rate suppose[d] to adjjust [sic] as the dollar/euro exchange
rate changes? How is this managed?" Id. ¶ 43. Nagem explained that
SIC had been computing rates based on the Money Gram and Western
Union rates. Id. ¶ 45. He further explained that, "the EURO/USD are
related, but in Mauritania the ratio maybe [sic] different in the
local currency than the Internationa[l] one, I am not sure. Money
Gram Rates today: 372, and 286, so the ratio is th[en] = 1.30. The
International ratio is = 1.35." Id. Nagem also asked for Choice's
position on how it would like SIC to determine rates going forward:
"D[o] we want to be competitive and follow Money Order [Money Gram]
rates as we have done in the past? OR do you want to get rates that
reflect a ratio: EURO/USD very close to market, and maybe lose
customers by doing so?" Id. ¶¶ 47-48.

Nagem did not recall Neuschatz responding to this email and
could not locate any such response in SIC's files. Id. ¶ 49.
According to Neuschatz, but disputed by defendants, he followed up on
this email by telephone and informed Nagem that Choice's expectation
would be that the MRO rates SIC provide would track the USD/Euro
exchange rate. See Defs. Reply to Rule 56.1 Counterstatement ¶¶ 57-58

(citing Declaration of Joseph Neuschatz in Opposition to Defendants' Motion for Summary Judgment ("Neuschatz Decl.") ¶ 51, ECF No. 30).[1]

Choice paid all of SIC's invoices for the period of 2007 through February 14, 2017. Pl. Response to Rule 56.1 Statement ¶ 59. According to Choice, it suffered only a few hundred dollars of loss in 2013 and 2014. Its losses in 2016 and 2017 were greater because: "(a) the dollar strengthened against the euro, such that the EUR/USD exchange rate dropped from about 1.33 to 1.06; and (b) the volume of euro-originating transactions that Choice processed for SIC increased substantially, from just a few million MROs disbursed in 2015 to tens of millions disbursed in 2017." Defs. Reply to Rule 56.1 Counterstatement ¶ 90. From 2013 to 2017, according to Choice, SIC's invoicing approach "sometimes resulted in undercharges and sometimes resulted in overcharges," but the net result was an overcharge of $220,665.72. Id. ¶ 77. Choice did not reimburse SIC for the period of February 15, 2017 through February 28, 2017, which was covered by a final invoice sent on March 1, 2017, id. ¶¶ 80, 85. SIC's counterclaim for breach of contract seeks payment of that final invoice.

---

[1] Neither party submitted evidence of whether it is the industry practice to tie exchange rates for exotic currencies to the exchange rate of more standard currencies, or of what MRO rates in fact were during the period when SIC's rates diverged from the USD/Euro rate, both of which the Court believes might be relevant to Choice's claims.

Under New York law, a party claiming breach of contract must prove "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994). Choice alleges that SIC breached the contract by overcharging it. Specifically, Choice alleges that SIC supplied Choice with MRO exchange rates inconsistent with the USD/Euro exchange rate. This resulted in overcharges, notwithstanding that Choice passed on SIC's exchange rates to its customers, because SIC did not distinguish between transactions that originated in dollars and those that originated in Euros when calculating amounts owed. That is, SIC, to calculate amounts owed, applied the USD/MRO exchange rate to the total amount of MRO paid.

A simple example of the issue Choice alleges is as follows: Assume an exchange rate of $2.00 to 1.00€ and that SIC has provided MRO exchange rates of $1.00 to 100 MRO and 1.00€ to 250 MRO. If SIC executes a customer's request to send 200€ to Mauritania, then SIC would pay out 50,000 MRO and request $500 from Choice, whereas Choice would have received $400 (200€) from the customer. The viability of defendants' counter-claim for breach of contract is tied to Choice's breach of contract claim because if defendants breached the contract first, then they cannot state a claim for breach of contract as they cannot establish their own performance of the contract.

9

The Agreement is silent on how SIC should set exchange rates. Choice argues, however, that SIC was required either to provide MRO exchange rates that tracked the USD/Euro exchange rate or adjust its invoices to account for the MRO exchanges rates' variation from the USD/Euro rate based on an oral modification of the contract by the parties and/or the parties' course of dealing. Choice's oral modification argument fails because Choice has offered no evidence that this alleged modification was supported by any consideration. See Baraliu v. Vinya Capital, L.P. et al., 765 F. Supp. 2d 289, 298 (S.D.N.Y. 2011) ("'To be enforceable, an oral modification must possess all of the elements necessary to form a contract, including valid consideration.'" (quoting Cohan v. Movtady, 751 F. Supp. 2d 436, 422 (E.D.N.Y. 2010)).

There is, however, a question of material fact as to whether the parties' course of dealing establishes that SIC had an obligation either to set MRO exchange rates consistent with the USD/Euro rate or to adjust its invoices to account for variation from the USD/Euro exchange rate. See Defs. Mem. at 14-16. "The law is not so rigid as to ignore the course of dealings between the parties . . . . It is well-established that not every term of a contract must be reduced to writing." Samad v. Goldberg, No. 12-CV-5429, 2016 WL 6678923, at *9 (S.D.N.Y. Nov. 14, 2016) (citing Perry v. Sindermann, 408 U.S. 593, 601-602 (1972)). Therefore, "[a]dditional contractual provisions may be 'implied' into a contract as a result of a course of dealing

10

between the parties. The parties through their conduct and practice can create additional rights and duties." Ezekwo v. New York City Health & Hosps. Corp., 940 F.2d 775, 782 (2d Cir. 1991). While a course of dealing would not alter the express terms of a contract when the contract is not ambiguous, see Metro Funding Corp. v. WestLB AG, No. 10-CV-1382, 2010 WL 1050315, at *24 (S.D.N.Y. Mar. 19, 2010), SIC does not (and could not) argue that the course of dealing alleged by Choice is inconsistent with any express term of the contract.

"A 'course of dealing' is commonly defined as 'a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.'" Well Luck Co., Inc. v. F.C. Gerlach & Co., Inc., 421 F. Supp. 2d 533, 540 (E.D.N.Y. 2005) (quoting Restatement (Second) of Contracts § 223(1) (1979)). "'There is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown, nor is it required that the course of dealing be consistent.'" Ward v. Nat'l Geo. Soc'y, 284 F. App'x 822, 823-824 (2d Cir. 2008) (quoting Restatement (Second) of Contracts § 223 cmt. b (1981)). "A course of dealings analysis does require, of course, an indication of the common knowledge and understanding of the parties." New Moon Shipping Co., Ltd. v. MAN B & W Disel AG, 121 F.3d 24, 31 (2d Cir. 1997).

Weighing the evidence in light most favorable to Choice, there is a genuine factual dispute as to whether the parties' course

11

of dealing evidences a common understanding that SIC was required either to provide MRO exchange rates consistent with the USD/Euro rate or to invoice in a manner that took into account any variance between the MRO exchange rates and the USD/Euro exchange rate.

On the one hand, weighing in favor of defendants is evidence that Nagem asked Neuschatz how SIC should calculate amounts owed from Euro-originating transactions, and Neuschatz instructed Nagem that he should apply the USD/MRO rate to the total MRO paid out. See Pl. Response to Rule 56.1 Statement ¶ 47 ("I would take the total in the local currency and divide it by the dollar rate and get the amount in dollars that Choice would have to pay."). That is, Neuschatz directed Nagem to use the very method that Choice now describes as a "major conceptual error." Pl. Mem. at 8.

In addition, Choice permitted SIC to set the rates at which SIC would pay out in local currency based on SIC's knowledge of the local market, Defs. Response to Rule 56.1 Counterstatement ¶ 27, which can diverge from the USD/Euro rate. For example, Choice's own expert explained, an "exotic" currency like MRO may not respond well to supply and demand: "[I]n exotic currencies, it's much trickier. The rates of the central banks may not be the rates you're able to actually achieve. . . . There's a lot of supply and demand stuff going on related to currencies that are not necessarily well satisfied in these countries that we refer to as exotic." Decl. of Michael J. Cohen in Opp. to Defs. Mot. for Summary Judgment Ex. C. at

12

120:8-121:3, ECF No. 28. And Nagem testified that there would be a variance between the "Mauritania Central Bank rate for dollars to euros" and "the rate that [one] might find for dollars to euros on any website," such as Bloomberg. Reply Affirmation of Stephen Nakamura in Further Support of Defendants' Motion for Summary Judgment ("Nakamura Reply Aff.") Ex. 21 at 70:9-72:23, ECF No. 33.

On the other hand, Neuschatz's instruction that SIC calculate amounts owed by dividing the total MRO paid out by the USD/MRO exchange rate can be read as implying, as Choice argues, that Neuschatz assumed the MRO exchange rates would be consistent with the USD/Euro rate. See Defs. Mem. at 14-15. (As Neuschatz himself concedes, however, this email "certainly could have been expressed more clearly." Neuschatz Decl. ¶ 44). Nagem's understanding that Nueschatz expected the MRO exchange rates to track the USD/Euro rate is suggested by a subsequent email from Nagem emphasizing the correlation between the Euro/MRO rate SIC was providing and the USD/Euro rate, Def. Reply to Rule 56.1 Counterstatement ¶ 50, as well as Choice's (disputed) contention that from 2008 to 2011, following these conversations, SIC's MRO exchange rates "by and large" tracked the USD/Euro rate, Neuschatz Decl. ¶ 47; Defs. Reply to Rule 56.1 Counterstatement ¶ 52. Nagem testified at his deposition that it was "possible" that he had discussed with Neuschatz or someone else at Choice that it was important for Choice that the rates SIC set were

13

consistent with the USD/Euro exchange rate. Defs. Reply to Rule 56.1
Counterstatement ¶ 43.[2]

Also significant is the email exchange between the parties in
February 2012, about a year before Choice alleges SIC began seeking
excessive reimbursement, Defs. Mem. at 1, 21. In this discussion,
Neuschatz informed Nagem that SIC had been operating on the
assumption that it should track competitors' MRO exchange rates,

---

[2] In addition, when Neuschatz was asked during his deposition whether
"there [was] any obligation for SIC or Mr. Nagem to set the dollar-
to-MRO rate and Euro-to-MRO rate in such a way that was consistent
with the dollar-to-euro rate," Neuschatz responded "there wasn't and
. . . that's a good question." Defs. Response to Rule 56.1
Counterstatement ¶ 40. In his declaration, however, Neuschatz
explained that he had "understood the defendants' attorney to be
asking whether there was an obligation within the Agreement itself."
Neuschatz Decl. ¶ 46. Neuschatz further explained that he "now
understand[s] that the question may have been asking whether the
phrase 'any obligation' included an obligation that arose outside the
four corners of the Agreement itself. Understood more broadly, . . .
the answer is plainly yes." Id. Defendants vigorously object to the
admission of Neuschatz's explanation of his deposition testimony. See
Reply Memorandum of Law in Further Support of Defendants' Motion for
Summary Judgment Pursuant to Rule 56 of the Federal Rules of Civil
Procedure ("Defs. Reply Mem.") at 2-5, ECF No. 34. First, they argue
that the "sham affidavit" rule, which "prevents a party from
submitting an affidavit that contradicts the party's prior deposition
testimony in order to raise an issue of fact sufficient to preclude
summary judgment," Rus, Inc. v. Bay Indus., Inc., 322 F. Supp. 2d
302, 307 (S.D.N.Y. 2003), applies here. But the rule does not apply
to later statements that seek to clarify or expand on deposition
testimony, id. at 308 (citing Palazzo ex rel. Delmage v. Corio, 232
F.3d 38, 43 (2d Cir. 2000)) - precisely what Neuschatz's declaration
does. Defendants also argue that the Court should discredit
Neuschatz's "excuse" for his deposition testimony as implausible.
Defs. Reply Mem. at 4-5. But the Court believes a reasonable juror
could find Neuschatz's explanation of his deposition testimony
credible. Together, therefore, Neuschatz's deposition testimony and
affidavit contribute to the contested nature of this question.

14

which could depart from the USD/Euro exchange rate. Nagem asked Neuschatz to advise whether "we want to be competitive and follow Money Order [Money Gram] rates as we have done in the past? OR do you want to get rates that reflect a ratio: EURO/USD very close to market, and maybe lose customers by doing so?" Defs. Reply to Rule 56.1 Counterstatement ¶¶ 47-48 (emphasis added). The parties dispute, however, whether Neuschatz responded to this request for clarification. According to defendants, Neuschatz did not respond. Id. ¶ 49. By contrast, Neuschatz stated in his declaration that he followed up with a telephone call in which he stated Choice's expectation that the MRO rates SIC provided would track the Euro-USD exchange rate. Id. ¶¶ 57-58. Because there is a genuine dispute as to whether Neuschatz clarified in February 2012 that Choice expected SIC to set MRO exchange rates that tracked the USD/Euro exchange rate, there is a dispute of material fact as to whether the parties' course of dealing imposed such an obligation on SIC.

Defendants argue alternatively that the voluntary payment doctrine bars Choice's claim for breach of contract. This doctrine "'bars recovery of payments voluntarily made with full knowledge of the facts, and in the absence of fraud or mistake of material fact or law.'" Fink v. Time Warner Cable, 810 F. Supp. 2d 633, 648-649 (S.D.N.Y. 2011) (quoting Dillon v. U-A Columbia Cablevision of Westchester, Inc., 100 N.Y.2d 525, 525 (2003)); see also Spagnola v. Chubb Corp., 574 F.3d 64, 72 (2d Cir. 2009) ("The voluntary payment

15

doctrine precludes a plaintiff from recovering payments made with full knowledge of the facts and with a lack of diligence in determining his contractual rights and obligations."). "[T]he voluntary payment doctrine does not apply when a plaintiff's claim is predicated on a lack of full disclosure by defendant." Fink, 810 F. Supp. 2d at 648-649 (citing Spagnola, 574 F.3d at 74). Defendants urge that Choice had "access to" all the same information as defendants, Defs. Mem. at 18: Choice knew the rates SIC set, Neuschatz knew the USD/Euro exchange rate "on a daily basis, and Choice reviewed the invoices provided by SIC and had the independent ability to review the rates reflected on those invoices, Pl. Response to Rule 56.1 Statement ¶¶ 34, 52, 56-67. See also Defs. Reply at 6-7.

Choice counters that the voluntary payment doctrine does not bar its claim for several reasons. The majority of its arguments are unpersuasive.[3] However, although it is a close question, the Court

---

[3] Choice first argues that it is "usual and customary in the money transfer industry for parties to resolve invoicing disputes through periodic reconciliations," and the parties themselves conducted such reconciliations. Pl. Mem. at 17-18. Choice asserts that "[t]he voluntary payment doctrine runs contrary to the notion of periodic reconciliations." Id. at 18. But that the parties conducted reconciliations - which provided Choice with a second opportunity to identify issues with SIC's invoices - lends further support to defendants' position that Choice's claims are barred by the voluntary payment doctrine. Even if it is the case that, as Choice contends and SIC disputes, SIC "refused" to participate in some reconciliations, Defs. Reply to Rule 56.1 Counterstatement ¶¶ 98-99, Choice's defense still fails. It appears that all the invoices SIC submitted were prepared in a similar manner, such that Choice had ample opportunity in the reconciliations SIC did participate in to correct the alleged "methodological and conceptual flaws." Pl. Mem. at 2. Choice next

agrees with Choice that "SIC's invoices were confusing," Defs. Mem.
at 19, and that the Court therefore cannot determine at summary
judgment whether the voluntary payment doctrine bars Choice's claim.
In so ruling, the Court bears in mind that "the proper operation of
the voluntary payment rule must be realistic rather than artificial.
The rule does not, for example, impute knowledge of relevant
circumstances of which the payor is not in fact aware, describing as
'voluntary' a payment that was actually the consequence of negligence
or inadvertence." Restatement (Third) of Restitution and Unjust
Enrichment § 6 (2011). When "[i]ssues of disclosure [and] notice" are
"contested," summary judgment is not appropriate. Fink, 810 F. Supp.
2d at 649.

Choice objects to "[t]he inclusion by SIC of the USD/MRO rate
[and] the EUR/MRO rate," which Choice alleges led it to believe that
the two MRO rates were each being used separately to arrive at the
volume of MRO dispensed to beneficiaries for USD and Euro

contends that the parties had a relational contract that, unlike
discrete transactional relationships, involve "not merely an
exchange, but also a relationship between the contracting parties . .
. flexible enough to adapt to changes of circumstances that could not
have been fully anticipated when the contract was negotiated." Kamco
Supply Corp. v. On the Right Track, LLC, 149 A.D.3d 275, 277 n.1
(N.Y. Sup. Ct. 2017). Even assuming arguendo that the parties did
have a relational contract, Choice does not supply any reason why the
voluntary payment could not apply to such contracts and the Court
cannot discern one. Third, Choice argues that it made payments under
"duress," because "[w]hen SIC issued an invoice, it demanded that
Choice pay immediately so that SIC would continue to have operating
funds." Defs. Mem. at 18-20. That SIC requested prompt payment does
not, however, establish that Choice acted under duress.

transactions. Pl. Mem. at 19. The Court finds somewhat not credible Choice's contention that it believed the two MRO rates were being used separately to arrive at the volume of MRO dispensed, since (at least in all the invoices submitted the Court) the row "MRO (ALL)" contained the exact same number for both the "USD" and "EUROS" columns, See, e.g., Neuschatz Decl. Ex. B, and it is highly unlikely that SIC ever (let alone always) distributed exactly the same amount of MROs from USD- and Euro-originating transactions and therefore facially implausible that these numbers reflected "the volume of MRO dispensed to beneficiaries for USD and Euro transactions." However, SIC concedes that "the second [row of the invoice] was supposed to contain information relating to transactions that originated in U.S. Dollars ("USD"), and the third was supposed to contain information relating to transactions that originated in Euros ("EUR"). Reply to Defs. Rule 56.1 Counterstatement ¶ 33 (emphasis added).

Choice also points out that the invoices included a "correct (or nearly correct) EUR/USD exchange rate on the bottom left," such that "Choice did not observe that SIC only used the USD/MRO rate to calculate what Choice allegedly owed." Pl. Mem. at 19. There also is good reason to doubt that Choice was so misled, since Neuschatz himself advised Nagem to calculate amounts owed by dividing the total MRO paid out by the MRO/USD exchange rate. See Neuschatz Decl. Ex. C at D00357. Furthermore, on many invoices one could simply divided the "MRO (ALL)" by the USD/MRO rate on the invoice to determine that SIC

18

was applying only the USD/MRO rate to calculate what Choice owed. See, e.g., Neuschatz Decl. Ex. E at 946 (the total MRO, 85,717,608, divided by the USD/MRO rate charged to Choice, 350, comes to the "TOTAL" amount of $244,907); id. at 1108 (similar); id. at 1147 (similar). But again, and especially because SIC's invoices were, in other respects, confusing, the Court cannot resolve the question of whether Choice's payments were in fact "voluntary" at the summary judgment stage.

Finally, the Court grants summary judgment in favor of defendants on Choice's claims for fraud and money had and received because these claims arise out of the same subject matter as the written contract.

Under New York law, where a valid and enforceable written contract exists, a litigant my not recover in quasi-contract for events arising out of the subject matter governed by the contract. See MacDraw, Inc. v. The CIT Grp. Equip. Fin., Inc., 157 F.3d 956, 964 (2d Cir. 1998). Choice argues that its claim is not predicated on the same subject matter governed by the contract because it arises from "portions of the parties' agreement that evolved based on oral understandings and/or an established course of dealing and/or performance." Pl. Mem. at 20. But Choice, especially in light of its course of dealing argument, cannot seriously "dispute[] that the subject matter of the transaction at issue in this case, and the essential terms and written conditions of the relationship between

19

the parties, was defined by a valid and enforceable written contract, precluding recovery in quasi-contract for events arising out of the transaction." Stampede Presentation Prods., Inc. v. Productive Transp., Inc., No. 12-CV-491A, 2013 WL 2245064, at *7 (W.D.N.Y. 2013). Therefore, the Court grants summary judgment for defendants on Choice's claim for money had and received.

In New York, no fraud claim lies against a party with whom a plaintiff contracted unless it "can (i) demonstrate that the fraud arises from a legal duty owed to plaintiff separate from the defendant's duty to perform under the contract, (ii) demonstrate that defendant has made a fraudulent misrepresentation collateral or extraneous to the contract, or (iii) demonstrate the plaintiff is entitled to special damages caused by the fraud that are unrecoverable as contract damages." Ikea N. Am. Servs., Inc. v. Northeast Graphics, Inc., 56 F. Supp. 2d 340, 342 (S.D.N.Y. 1999) (citing Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19-20 (2d Cir. 1996)). Choice cannot make any such showing. Choice's claim is based on SIC's allegedly concealing the volume of MROs paid out from European transactions, obscuring that SIC's invoices calculated the amount due based only on the USD/MRO rate for all transactions, and leading Choice to believe it used the Euro-USD exchange rate to compute the principal amount due, when really it used that rate only to calculate commissions. Pl. Mem. at 27. But "even intentionally misleading statements by a defendant

20

falsely indicating an intent to perform under a contract and/or concealing a breach of contract do not give rise to an action for fraud." Ikea N. Am. Servs., 56 F. Supp. 2d at 342. Because that is exactly what Choice's fraud claim asserts, the claim cannot lie.

Accordingly, for the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. The parties should jointly call chambers by December 22, 2017 to set a trial date.

SO ORDERED.

Dated:    New York, NY
          December *15*, 2017                    JED S. RAKOFF, U.S.D.J.